**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **DRIVETRAIN, LLC, as Trustee** | : | |
| **of the Adeptus Litigation Trust,** | : | **Civil Action No. _____** |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS S. HALL,** | : | **JURY TRIAL DEMANDED** |
| **TIMOTHY L. FIELDING, and** | : | |
| **GRAHAM B. CHERRINGTON,** | : | |
| | : | |
| **Defendants.** | : | |

## ORIGINAL COMPLAINT

Drivetrain, LLC, as Trustee (the "Trustee") of the Adeptus Litigation Trust (the "Trust"), hereby brings this action against Defendants Thomas S. Hall, Timothy L. Fielding, and Graham B. Cherrington (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      This action is about breaches of fiduciary duty committed by each of the Defendants in their roles as officers of First Choice ER, LLC ("First Choice").  Through their gross negligence and bad faith, Defendants caused First Choice to pay over $100 million to cover expenses and obligations that it had no responsibility or authority to pay.

2.      Until its bankruptcy filing in April 2017, First Choice was the operating entity for the largest network of freestanding emergency rooms in the United States (the "Adeptus Enterprise").  As officers of First Choice, its parents, and its subsidiaries, Defendants owed

fiduciary duties to the Adeptus Enterprise, in general, and to First Choice, specifically.  These included duties of care, loyalty, and obedience.

3.      Despite these duties, each of the Defendants acted with gross negligence and/or bad faith with respect to three different joint ventures that they caused the Adeptus Enterprise to initiate and which they were to manage and oversee.  Under the terms of the joint ventures, Defendants agreed that the Adeptus Enterprise would advance a $3 million line of credit to each joint venture to fund its start-up expenses.  Functionally, these advances would come from First Choice, as the owner of the Adeptus Enterprise's operating and deposit accounts.  After this credit line was exhausted, the joint venture's operations were supposed to cover expenses and working capital needs and, eventually, to pay off the line of credit.  If the joint venture was unable to cover these costs, however, they were to be split between the Adeptus Enterprise and its joint-venture partners, with the Adeptus Enterprise bearing less than half of those expenses.  That is what Defendants told the investing public and the majority of the Board of Directors for Adeptus Health Inc. (the "Adeptus Non-Insider Board"),[1] the ultimate parent company of the Adeptus Enterprise.  Indeed, Defendant Hall publicly declared that, with this cost-sharing structure, the joint ventures were "deleveraging" the Adeptus Enterprise.

4.      In reality, Defendants created a system entirely lacking in internal controls to monitor or otherwise ensure that First Choice advanced no more than $3 million to the joint ventures.  The result was that once First Choice began to advance start-up costs, there was nothing to prevent Defendants from having it pay all ongoing expenses of the joint ventures.  In other words, notwithstanding contractual terms, board authorizations, and public statements to the contrary, Defendants developed and implemented a structure whereby once they turned on the

---

[1] Adeptus Health Inc. had an eight-member board of directors.  The references to the Adeptus Non-Insider Board contained herein refer to the board of directors, exclusive of Defendant Hall and Daniel W. Rosenberg.

spigot of First Choice money, there was nothing in place to turn it off, slow it down, or alert anyone that the joint ventures were draining First Choice's cash.

5.      Thus, when the Adeptus Enterprise's first joint venture (the "Arizona JV") exhausted its $3 million line of credit within only a month of launching, the Adeptus Non-Insider Board had no clue.  And thus the Adeptus Non-Insider Board similarly did not realize that First Choice was continuing to fund and backstop the Arizona JV's unprofitable operations well beyond the approved $3 million commitment.

6.      By the time that Defendants launched the second joint venture (the "Colorado JV"), the Arizona JV had burned through $4.2 million of First Choice cash.  Despite knowing that this $1.2 million overextension was unapproved and undocumented, Defendants did not adjust their practices.  As with the Arizona JV, Defendants (a) had the Adeptus Non-Insider Board approve a $3 million line of credit to the Colorado JV, (b) treated the Colorado JV facilities as though they were wholly owned subsidiaries of First Choice, and then (c) failed to implement any internal controls or monitoring to ensure that First Choice advanced no more than the agreed-to, approved $3 million to the Colorado JV.

7.      The Colorado JV exhausted its line of credit in less than a year.  And as before, thanks to Defendants' abdication and inattention, First Choice continued to underwrite its expenses and losses (along with those of the Arizona JV).

8.      By the time that they launched the third joint venture (the "Texas JV"), Defendants had caused First Choice to burn over $25 million backstopping the Arizona JV and the Colorado JV.  Defendants, however, continued to keep the Adeptus Non-Insider Board in the dark.  The Adeptus Non-Insider Board had no idea that First Choice was funding all expenses of the joint ventures.  The Adeptus Non-Insider Board had no idea that Defendants were ignoring the approved

credit lines.  And the Adeptus Non-Insider Board had no idea that, as a result, First Choice had spent $25 million funding the joint ventures.  Unaware that Defendants planned to continue these practices for the Texas JV as well, the Adeptus Non-Insider Board approved the Texas JV and its underlying agreements.  As with the Arizona JV and the Colorado JV, Defendants ignored the terms of these underlying agreements and affixed all downside risk of the Texas JV to First Choice and thus to the Adeptus Enterprise.

9.      By the end of 2016, Defendants had caused First Choice to subsidize the joint ventures with nearly $94 million—$85 million more than what (a) the agreements had authorized, (b) the Adeptus Non-Insider Board had approved, and (c) the public had been told.  Making matters worse, the economics of the joint ventures continued to deteriorate.

10.     The Adeptus Enterprise filed bankruptcy in April 2017.  By that point, Defendants had caused First Choice to pay over $100 million in unauthorized advances to fund the joint ventures.  Being uncollectable, this nine-figure sum had to be written off.

## JURISDICTION AND VENUE

11.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because it involves an amount-in-controversy exceeding $75,000, excluding interest and costs, and the parties are citizens of different states.

12.     The Court has personal jurisdiction over Defendants because each of them, through their continuous and systematic contacts with Texas, purposefully availed themselves of the benefits and protections of Texas's laws and should reasonably anticipate being haled into court in Texas.  Defendant Fielding is also a Texas citizen.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to the Trustee's claims occurred in this district.

## PARTIES

### A.    Plaintiff

14.    The Trustee is a New York limited liability company headquartered in New York whose members are citizens of New York and California.  The Trustee has standing to pursue this action on behalf of the Trust, which was created pursuant to the bankruptcy court's order confirming the plan of reorganization (the "Plan") in the jointly administered bankruptcy cases captioned as *In re ADPT DFW Holdings LLC, et al.*, Case No. 17-31432-SGJ (Bankr. N.D. Tex.) (the "Bankruptcy Case").[2]  Pursuant to the Plan, all causes of action that First Choice and each of its affiliated debtors held against former insiders and officers vested in the Trust.  The Trustee was appointed pursuant to the court-approved Litigation Trust Agreement[3] and unanimously confirmed by the Trust's Litigation Oversight Board in February 2018.

### B.    Defendants

15.    Defendant Thomas S. Hall is a citizen of Florida.  He served as Chief Executive Officer to First Choice at its headquarters in Denton County, Texas, from March 2012 until November 2016.

16.    Defendant Timothy L. Fielding is a citizen of Denton County, Texas.  He served as Chief Financial Officer of First Choice at its headquarters in Denton County, Texas, from January 2013 until his resignation became effective on September 30, 2016.

17.    Defendant Graham B. Cherrington upon information and belief is a citizen of Georgia or Texas.  He served as Chief Operating Officer of First Choice at its headquarters in Denton County, Texas, from May 2012 until his employment was terminated in December 2016.

---

[2] The confirmation order is Docket No. 821 in the Bankruptcy Case.
[3] The court-approved Litigation Trust Agreement is Docket No. 822-1 of the Bankruptcy Case.

**C.      Other Relevant Non-Parties**

18.      Adeptus Health Inc. ("Adeptus Inc.") was the publicly traded entity at the top of the Adeptus Enterprise.  At all relevant times, Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of Adeptus Inc.  During the relevant time period, Adeptus Inc. was the organization within the Adeptus Enterprise with a board of directors consisting of eight directors.  Adeptus Inc. managed and owned interests in its subsidiary, Adeptus Health LLC ("Adeptus LLC").

19.      Adeptus LLC was the holding company for the Adeptus Enterprise.  At all relevant times, Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of Adeptus LLC.  Adeptus LLC was the parent and manager of First Choice.

20.      First Choice was a Texas limited liability company that served as the operating entity for the Adeptus Enterprise.  At all relevant times, Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of First Choice.  As the operating entity, First Choice owned and maintained the operating and deposit bank accounts for the Adeptus Enterprise and owned and managed several subsidiaries, including Adeptus Health Management LLC ("Adeptus Management") and Adeptus Health Ventures LLC ("Adeptus Ventures").

21.      Adeptus Management, a Texas limited liability company, was one of First Choice's wholly owned and managed subsidiaries.  At all relevant times, Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of Adeptus Management.

22.     Adeptus Ventures, a Texas limited liability company, was another of First Choice's wholly owned and managed subsidiaries.  At all relevant times, Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of Adeptus Ventures.  Adeptus Ventures owned and managed different wholly owned subsidiaries, including Adeptus Health Phoenix Holdings LLC ("Adeptus Phoenix"), Adeptus Health Colorado Holdings LLC ("Adeptus Colorado"), and ADPT DFW Holdings LLC ("Adeptus Texas").  Defendants Hall, Fielding, and Cherrington were, respectively, the Chief Executive Officer, the Chief Financial Officer, and the Chief Operating Officer of Adeptus Phoenix, Adeptus Colorado, and Adeptus Texas.

23.     The relevant portion of the Adeptus Enterprise related to this action was organized as follows:



24.     Adeptus Inc., Adeptus LLC, First Choice, Adeptus Management, Adeptus Ventures, Adeptus Phoenix, Adeptus Colorado, and Adeptus Texas were all headquartered in and operated out of Denton County, Texas.  These entities were also debtors in the Bankruptcy Case whose causes of action vested in the Trust pursuant to the Plan and the Litigation Trust Agreement.

## FACTUAL BACKGROUND

**A.     The Adeptus Enterprise Consolidated Its Operations.**

25.     The company that eventually became the Adeptus Enterprise began in 2002.  By the time that Adeptus Inc. completed its initial public offering in June 2014, the Adeptus Enterprise owned and operated the largest independent network of freestanding emergency rooms in the United States.  Headquartered in Lewisville, Texas, the Adeptus Enterprise's operations spread across Texas and Colorado at the time of the IPO.

26.     At the top of the Adeptus Enterprise was Adeptus Inc., the publicly traded company whose sole asset was membership interests in the subsidiary that it managed, Adeptus LLC. Adeptus LLC served as the holding company for the Adeptus Enterprise.  It was the sole member and manager of First Choice, the operating entity for the Adeptus Enterprise.  First Choice, in turn, owned and managed the rest of the Adeptus Enterprise.

27.     That enterprise included over 100 subsidiaries, where, at the bottom of the chain each freestanding emergency room was its own limited liability company managed by its parent or its parent's affiliate.  The Adeptus Enterprise consolidated its financial results, rolling up each level of its multi-level structure into a consolidated balance sheet, income statement, and statement of cash flows.  Likewise, the various bank accounts of the Adeptus Enterprise were swept daily with those funds ultimately landing in either the deposit or operating accounts of First Choice. Expenses and costs of the Adeptus Enterprise were paid from First Choice's operating account, which Defendants, as officers of First Choice, controlled.

**B.     Adeptus Shifted Its Business Model to Focus on Joint Ventures.**

28.     From even before Adeptus Inc.'s initial public offering, Defendants were focused on expanding operations through partnerships with existing hospital systems.  That strategy was

sold as a positive under the theory that it would (a) enable the Adeptus Enterprise to take (and bill for) TRICARE, Medicare, and Medicaid patients and (b) increase patient visits by leveraging each hospital system's trusted brand while, simultaneously, sharing operational risk with the joint venture partner.

29.     The first joint venture was the Arizona JV, which was formed in October 2014 between Adeptus Phoenix and Dignity Health ("Dignity"), a nonprofit hospital system in Arizona. Six months later, Adeptus Colorado and University of Colorado Health ("UCH"), a nonprofit hospital system in Colorado, formed the Colorado JV.  A year after that, in May 2016, Adeptus Texas and Texas Health Resources ("THR"), a nonprofit corporation operating a hospital system in Texas, formed the Texas JV.  The legal names for the Arizona JV, the Colorado JV, and the Texas JV were, respectively, AGH Phoenix LLC, UCHealth Partners LLC, and FTH DFW Partners LLC.

30.     Each of the joint ventures was structured largely the same.  The nonprofit partner owned 50.1% of the joint venture, and the corresponding Adeptus Enterprise subsidiary (Adeptus Phoenix for the Arizona JV, Adeptus Colorado for the Colorado JV, and Adeptus Texas for the Texas JV) owned the remaining 49.9%.

31.     These ownership percentages as well as the rights and responsibilities of each joint venture member were memorialized in similar operating agreements.  The Arizona JV was governed by the Amended and Restated Operating Agreement of AGH Phoenix LLC (the "Arizona Operating Agreement").  The Colorado JV was governed by the Operating Agreement of UCHealth Partners LLC (the "Colorado Operating Agreement").  And the Texas JV was governed by the Operating Agreement of FTH DFW Partners LLC (the "Texas Operating Agreement" and

with the Arizona Operating Agreement and the Colorado Operating Agreement, the "Operating Agreements").

**C.     The Operating Agreements Should Have Limited the Adeptus Enterprise's Exposure to the Joint Ventures.**

32.     Each Operating Agreement appointed a governing board of directors for its joint venture.   The Arizona Operating Agreement and the Colorado Operating Agreement each appointed a four-person board.  Defendants Cherrington and Fielding served as two of the directors on those four-person boards.   The other two directors on each board were representatives of Dignity and UCH, respectively.

33.     The Texas Operating Agreement appointed a six-person governing board. Defendant Cherrington and two other Adeptus employees served as the Adeptus representatives. THR appointed the other three directors.

34.     The Operating Agreements also appointed officers for each joint venture. Defendants Fielding and Cherrington were appointed as officers of the Arizona JV and the Colorado JV.  Their fellow officers were appointed by Dignity and UCH.  Defendant Cherrington was also appointed as an officer of the Texas JV.  Three of his fellow officers were appointed by THR.

35.     The capital structure of each joint venture was similar.   In Arizona, Adeptus Phoenix pledged $3 million of First Choice cash to acquire a 49.9% stake and agreed to extend a $3 million line of credit to fund the Arizona JV's working capital needs.  In Colorado, Adeptus Colorado pledged both cash and existing facilities for its 49.9% stake, with the cash component being capped at $7,200,000.  As with Arizona, Adeptus Colorado also agreed to extend a $3 million line of credit to fund the Colorado JV's working capital needs.  The Texas Operating Agreement, on the other hand, did not include a cash contribution.  Instead, Adeptus Texas contributed only

existing freestanding emergency rooms and a hospital to acquire its 49.9% stake in the Texas JV. As with Arizona and Colorado, Adeptus Texas agreed to extend a $3 million line of credit to fund the working capital needs of the Texas JV.

36.    The lines of credit were memorialized in Loan and Security Agreements and accompanying Revolving Notes.  Defendant Fielding signed the Loan and Security Agreements and Revolving Notes applicable to the Arizona JV and the Colorado JV.  Defendant Cherrington signed the Loan and Security Agreement and Revolving Note for the Texas JV.  Because First Choice was the owner of the deposit and operating accounts of the Adeptus Enterprise, any cash advanced on the different lines of credit originated from First Choice's accounts.

37.    The nonprofits did not contribute cash or facilities to the joint ventures.  Instead, Dignity, UCH, and THR each contributed only a license for the joint ventures to use their respective trademarks and brand.

38.    Under the Operating Agreements, certain actions, like capital calls and modifying existing contracts or executing new ones between the joint ventures and any entity within the Adeptus Enterprise, were forbidden unless approved by each joint venture's governing board and owners.  Approval by the boards of the Arizona JV and the Colorado JV required the blessing of 75% of the directors, and approval by the board of the Texas JV required unanimous consent.  The Operating Agreements further provided that, even if a capital call was approved by the governing boards, the Adeptus Enterprise was responsible for making only 49.9% of the total contribution.

**D.    The Management Agreements Should Have Limited the Adeptus Enterprise's Exposure to the Joint Ventures.**

39.    In connection with the Operating Agreements, the different joint ventures and Adeptus Management executed management services agreements (the "<u>Arizona Management Agreement</u>," the "<u>Colorado Management Agreement</u>," and the "<u>Texas Management Agreement</u>,"

11

and, collectively, the "Management Agreements"), whereby Adeptus Management agreed to provide day-to-day management services to the joint ventures.

40.    Defendant Fielding signed the Arizona Management Agreement and the Colorado Management Agreement on behalf of Adeptus Management.  Defendant Cherrington signed the Texas Management Agreement on behalf of Adeptus Management.

41.    One of Adeptus Management's duties under the Management Agreements was to manage all financial operations of the joint ventures, including payment on behalf of the joint ventures of all their operating expenses and payables.  Nothing, however, obligated Adeptus Management to cover these costs with Adeptus Enterprise funds.  Adeptus Management was to pay these costs with monies generated by each joint venture.  Indeed, each of the Management Agreements expressly forbids Adeptus Management from taking actions that required approval of a joint venture's governing board or members, such as modifying the Loan and Security Agreement or Revolving Note or otherwise advancing cash from First Choice accounts beyond the $3 million line of credit.  Adeptus Management could not even arrange a loan to a joint venture absent prior approval of at least 75% of that joint venture's governing board, and even then, the joint venture's nonprofit member would be responsible for 50.1% of the loan balance if the joint venture were to default.

42.    The Management Agreements also contained more immediate provisions protecting First Choice's exposure to the joint ventures.  For example, the Arizona Management Agreement did not allow Adeptus Management to be reimbursed for advancing funds to the Arizona JV, thereby stripping away any incentive to make advances.  When managing the Arizona JV, Adeptus Management was entitled to reimbursement for only two kinds of expenses.  The first was for the overhead of Adeptus Enterprise employees who provided services to the Arizona JV

on behalf of Adeptus Management (Adeptus Management had no employees of its own).[4]  These individuals differed from the Arizona JV's own employees, who ran the different facilities.  The second category of reimbursable expenses consisted of only physician-recruitment expenses, insurance coverage premiums, and fees incurred hiring outside consultants.  Thus, Adeptus Management had no contractual right to be reimbursed if it advanced payroll or other working capital needs.

43.     Although the Colorado Management Agreement and the Texas Management Agreement did permit Adeptus Management to advance funds, they nevertheless imposed protections to limit the Adeptus Enterprise's downside risk.  Each required the joint venture to reimburse Adeptus Management for advances within, at most, six weeks.  And on top of this timing requirement, the lines of credit and revolving notes capped First Choice's exposure to the Colorado JV and Texas JV at $3 million apiece, with the obligation to repay 50.1% of that sum falling on UCH and THR if the joint ventures defaulted.

44.     Operationally, then, Adeptus Management's services were to proceed as follows.  In Arizona and Colorado, Adeptus Management was to pay joint venture obligations with funds generated by the joint ventures, and if those were insufficient, Adeptus Management was to draw on the pledged cash contributions.  If those contributions were exhausted and the funds generated by the joint ventures' operations were still insufficient to cover obligations, Adeptus Management was to then draw on the agreed-to lines of credit up to their $3 million maximums.

45.     In Texas, there was no cash contribution for Adeptus Management to draw down.  Instead, Adeptus Management was to again first pay obligations with funds generated by the Texas

---

[4] All Adeptus Enterprise employees were employees of FCER Management LLC, a wholly owned and managed subsidiary of First Choice.  FCER Management LLC was also a debtor in the Bankruptcy Case whose causes of action vested in the Trust pursuant to the Plan.

JV, and if those were insufficient, it could ostensibly advance First Choice cash so long as it was reimbursed from the next month's operations.  If there were shortfalls, the documents governing the Texas JV allowed Adeptus Management to "reimburse" itself for those advances by drawing on the $3 million lines of credit.

46.     In Arizona, Colorado, and Texas, however, once the lines of credit were exhausted, Adeptus Management had no authority or ability to fund operations.  Neither did Adeptus Phoenix, Adeptus Colorado, Adeptus Texas, their parent Adeptus Ventures, First Choice, nor any other entity in the Adeptus Enterprise.

47.     In short, once the $3 million lines of credit to the Arizona JV, the Colorado JV, and the Texas JV were exhausted, they were not eligible to receive any additional First Choice cash.

**E.     Cash Flows from the Joint Ventures Never Sustained Their Operations.**

48.     The Adeptus Non-Insider Board and Dignity approved the Arizona JV in October 2014.  It began operations in January 2015.

49.     Within a month, the Arizona JV had burned through Adeptus Phoenix's $3 million capital contribution plus $2.6 million of the pledged line of credit.  It continued to lose money for the rest of 2015 and 2016 and until the Bankruptcy Case was filed in 2017.  Notwithstanding the protections and prohibitions in the Arizona Operating Agreement and Arizona Management Agreement, these deficits and more were funded with cash from First Choice's accounts.  In fact, all of the Arizona JV's expenses—including its accounts payable and payroll—ended up being covered by First Choice, despite the fact that the $6 million pledged to the Arizona JV had been exhausted by March 1, 2015 (58 days after opening).

50.     The same result occurred in Colorado.  The Adeptus Non-Insider Board and UCH approved the Colorado JV in April 2015—a month after the Arizona JV had already blown through

14

its capital—and it began operations that same month.  In less than a year, the Colorado JV had exhausted its capital and its $3 million credit line.  Notwithstanding the protections and prohibitions in the Colorado Operating Agreement and the Colorado Management Agreement, the Colorado JV's deficits continued to be backstopped with First Choice cash.  Within 30 days of exhausting its credit line, the Colorado JV had cost First Choice another $3 million.  This pace would continue for the rest of 2016, with the Colorado JV costing First Choice $2.5 million a month.

51.     The results in Texas were even worse.  The Adeptus Non-Insider Board and THR approved the Texas JV and its underlying agreements in May 2016, and the Texas JV began operating immediately.  It exhausted its $3 million line of credit in less than a month.  Six months later, it had burned through another $50 million of First Choice cash.  By the end of 2016, First Choice had lost over $54 million funding the Texas JV's losses.

**F.     Defendants Caused First Choice to Backstop the Joint Ventures.**

52.     Defendants abdicated their duties and utterly failed to implement a reporting system with respect to the joint ventures' use of First Choice cash.  The continual and unauthorized funding of the joint ventures occurred because Defendants intentionally or recklessly set it in motion without any monitoring or controls to prevent that hazardous risk.

53.     As officers of Adeptus Management, Adeptus Ventures, Adeptus Phoenix, Adeptus Colorado, Adeptus Texas, and First Choice, Defendants treated—and had the employees of the Adeptus Enterprise treat—the joint ventures and their facilities as if they were wholly owned subsidiaries of the Adeptus Enterprise.  Each joint venture's financial statements were consolidated with the rest of the Adeptus Enterprise, and its expenses and debts were paid with cash from First Choice's bank accounts.  Each month, when Adeptus Management collected less than what First

Choice had already paid to the joint venture's vendors and employees, Adeptus Management booked those deficits as a receivable within the Adeptus Enterprise.  In short, although the joint ventures and their facilities did not belong to the Adeptus Enterprise, Defendants had them treated as though they did, thereby causing First Choice and the rest of the Adeptus Enterprise to assume all operational and financial risk of the joint ventures.

54.     Having caused First Choice to assume these risks, Defendants then failed to monitor or otherwise enforce the negotiated $3 million credit limits that would have otherwise mitigated these risks and protected First Choice.  Defendants gave the joint ventures and their facilities a blank check.

55.     This approach had not been authorized by or even discussed with the Adeptus Non-Insider Board, the governing boards of the joint ventures, or Defendants' fellow officers at the joint ventures.   Nor was it authorized or permitted by the Operating Agreements or the Management Agreements.  In fact, in their SEC filings, Defendants insisted that the joint venture operations were not consolidated with those of the Adeptus Enterprise.   Under this guise, Defendants reported patient revenues from the joint ventures in their "systemwide" results but excluded the joint venture losses from their supposedly GAAP-compliant financials.

56.     The accounting methods and treatment that Defendants had Adeptus Management employ for the joint ventures did not allow for alerts or stops if and when a joint venture exhausted its $3 million credit line.  As with the rest of the Adeptus Enterprise, each facility in the different joint ventures had its own account number within the Adeptus Enterprise's consolidated accounting system.  Indeed, although the facilities that the Adeptus Enterprise had contributed to the Colorado JV and the Texas JV were given new accounting numbers within the Adeptus Enterprise's consolidated accounting system, nothing else changed.  For instance, although the

Arizona JV, the Colorado JV, and the Texas JV each had their own account numbers, expenses billed at the facility level were not rolled into those joint venture accounts before being rolled into the systemwide, consolidated books of the Adeptus Enterprise.

57.     Thus, for example, when an Arizona JV freestanding emergency room or one belonging to the Colorado JV or the Texas JV bought cotton balls, that expense did not roll into the accounts of the different joint ventures or otherwise end up in a sum of the expenses of that joint venture.  Nor were those cotton balls purchased with joint venture cash.  Instead, they were bought with First Choice cash and booked internally as an intercompany receivable owed by that single facility to the rest of the Adeptus Enterprise.

58.     That is, with no plan and no forethought, Defendants deployed and allowed a system where First Choice bore 100% of the risk of the joint ventures, despite the fact that (a) the Adeptus Enterprise owned only 49.9% the joint ventures, (b) no board of directors authorized this system, (c) no document required or authorized this approach, (d) no professional had blessed it, (e) the joint ventures, themselves, had not agreed to it, (f) First Choice was totally exposed for tens of millions of dollars in making these bets, (g) the rest of the Adeptus Enterprise could not survive First Choice's taking such losses, (h) neither First Choice nor any other entity in the Adeptus Enterprise stood to benefit from taking such risks, and (i) Defendants were aware of all this.

59.     Each month, a staff accountant at First Choice would manually prepare spreadsheets summarizing, reconciling, and reclassing amounts that First Choice had paid on behalf of each joint venture in the previous month and offset those amounts against cash collected that same month from the joint venture's operations.  These efforts would calculate the receivable that the joint venture owed to First Choice (the "JV Receivable") at month-end.  On information and belief, none of the staff accountants nor any of other personnel in the accounting department

was told or was aware that each JV Receivable had a cap of $3 million.  Nor, on information and belief, were they instructed to alert their supervisors when that cap was exceeded.

60.     Defendant Fielding reviewed and approved these JV Receivable spreadsheets each month and was therefore fully aware of the fact that (a) the JV Receivable for the Arizona JV (the "Arizona JV Receivable") exceeded its $3 million cap by March 2015 and remained above $3 million thereafter, (b) the JV Receivable for the Colorado JV (the "Colorado JV Receivable") exceeded its $3 million cap by April 1, 2016 and remained above $3 million thereafter, and (c) the JV Receivable for the Texas JV (the "Texas JV Receivable") exceeded its $3 million limit by June 1, 2016 and remained above $3 million thereafter.  Defendants Hall and Cherrington, in their management roles at the joint ventures and Adeptus Management, Adeptus Phoenix, Adeptus Colorado, Adeptus Texas, Adeptus Ventures, and First Choice likewise knew or should have known this fact too.  They reviewed the financial statements, knew that First Choice cash was being used to pay all overhead and operating expenses of the joint ventures, and knew that the joint ventures were not collecting cash fast enough to support their operations.

61.     Each Defendant had a duty to monitor and enforce the credit limits because they were the officers of Adeptus Phoenix, Adeptus Colorado, Adeptus Texas, Adeptus Management, and First Choice, who had no employees of their own.  Plus, each Defendant knew or should have known that, because they were consolidating the joint ventures' facilities and financials with the rest of the Adeptus Enterprise, monitoring and enforcing the credit limits was the only way to protect First Choice from becoming the underwriter and guarantor of all joint venture debts.  Plus, each Defendant knew that, because they were consolidating the joint ventures' financial results with those of the Adeptus Enterprise, neither the Adeptus Non-Insider Board nor the governing

boards of the joint ventures would be able to track the different JV Receivables (or even know that they existed).

62.     By April 2015, the Arizona JV Receivable was $4.2 million, $1.2 million above the approved credit line.  Defendants failed to disclose this to anyone and also failed to disclose that they were having First Choice underwrite the Arizona JV's losses when they asked the Adeptus Non-Insider Board to approve the Colorado JV on April 20, 2015.

63.     By December 2015, the Arizona JV Receivable was more than $15 million.  By December 2016, the Arizona JV Receivable was more than $38 million.  And by the time that First Choice filed bankruptcy, the Arizona JV Receivable was more than $44 million, with First Choice having paid more than $108 million in cash to cover the Arizona JV's debts.

64.     The Colorado JV Receivable followed a similar moonshot.  When Defendants were asking the Adeptus Non-Insider Board to approve the Texas JV in May 2016, they failed to disclose that the Colorado JV Receivable was already north of $3 million and that the Arizona JV Receivable was, itself, more than $19 million.  By December 2016, the Colorado JV Receivable and the Arizona JV Receivable were more than $64 million ($58 million above the limits approved by the Adeptus Non-Insider Board and the respective joint venture governing boards).

65.     As noted above, the Texas JV Receivable ballooned fastest of all.  In seven months, the Texas JV Receivable skyrocketed to more than $54 million.  While these losses—along with those of the Colorado JV—would have been backstopped, to an extent, by First Choice had Adeptus Colorado and Adeptus Texas not contributed the cash-draining facilities to the Colorado JV and the Texas JV, the fact that those facilities had been contributed (and were no longer owned by the Adeptus Enterprise) meant that the Adeptus Enterprise would have shouldered, at most,

49.9% of these losses (had the advances received the necessary approvals), rather than First Choice advancing 100% of the lost cash.

66.     Ultimately, the Adeptus Enterprise and FCER filed for bankruptcy in April 2017 and wrote off more than $100 million in JV Receivables.  This figure would have been less than $4.5 million had Defendants enforced the contracts that they signed and protected the entities that they were duty-bound to protect.  Although the Arizona JV, Colorado JV, and Texas JV were entitled to draw $9 million of First Choice cash under their lines of credit, 50.1% of that debt was effectively guaranteed by Dignity, UCH, and THR.

**G.     First Choice's Massive Losses Were Avoidable.**

67.     Had Defendants implemented controls to guard against First Choice underwriting the joint ventures, the JV Receivables could have been manageable or at least orders of magnitude less than they were.

68.     For instance, when Defendants had the Adeptus Non-Insider Board approve the Colorado JV, the Arizona JV Receivable was $4.2 million (*i.e.*, Adeptus Phoenix's $3 million capital contribution had been spent, the $3 million line of credit had been exhausted, and First Choice had "advanced" another $1.2 million in cash).  This should have alerted Defendants (and they should have alerted the Adeptus Non-Insider Board) to the need for either (a) their nonprofit partners to contribute cash to the joint ventures through either a capital contribution or a loan or (b) increased lines of credit from the Adeptus Enterprise, subject, of course, to Adeptus Non-Insider Board approval.  The Operating Agreements allowed for both options, and both would have reduced the strain on—and risk to—First Choice.

69.     Having been informed of the Arizona JV's underperformance, the Adeptus Non-Insider Board could then have made informed decisions regarding the risks of allowing the

arrangements in Colorado and later Texas that they, instead, blindly approved.  The Adeptus Non-Insider Board could have also required Defendants to implement controls to prevent the continued unauthorized and undocumented advances of First Choice cash to the joint ventures.  Instead, Defendants kept the Adeptus Non-Insider Board in the dark, and no such discussions, requirements, or approvals occurred.

70.     The performance of the joint ventures did not moot the potential mitigating effects of these actions.  Although implementing monitoring and controls would not have transformed underperforming facilities into profitable ones, they would have at least halved the losses that First Choice suffered.  For instance, when the management who took over for Defendants was attempting to solve the liquidity crisis in December 2016, they brokered a deal with UCH whereby $12.6 million of the Colorado JV Receivable was converted into a capital contribution and First Choice received roughly $8.5 million in cash from UCH.  Although the Colorado JV Receivable was still $11.4 million even after this restructuring, it shows what was possible had Defendants not abdicated their duties.[5]

71.     Indeed, similar efforts were successful with respect to the Arizona JV Receivable and the Texas JV Receivable, decreasing them to $44.3 million and $51.1 million, respectively, before the Bankruptcy Case was filed.  Had these negotiations occurred while the JV Receivables were still manageable, the guarantors of the growing receivables—the nonprofit hospital systems—and the Adeptus Non-Insider Board would have insisted on close monitoring and, when needed, restructurings, sales, and closings of underperforming locations instead of allowing the joint ventures to continue to drain First Choice cash (and increase each partner's resulting liability).

---

[5] This $11.4 million Colorado JV Receivable grew another $7 million until the Bankruptcy Case was filed, however, because even new management did not realize that Defendants had structured the Colorado JV's economics such that First Choice was paying for costs and expenses that it had no obligation (or authority) to cover.

72.     Without the overhead, costs, and lagging performance of these facilities and without First Choice funding the joint venture facilities, the JV Receivables would have been at least $50 million less, if not $95.5 million less, and the Adeptus Enterprise could have avoided the liquidity crisis altogether.

## CAUSES OF ACTION

### Count 1
### Breach of Fiduciary Duty of Care

73.     The Trustee re-alleges the allegations set forth the above paragraphs.

74.     Defendants, as officers of First Choice, each owed a fiduciary duty of care to First Choice to act in an informed, deliberate, and rational manner to protect First Choice's interests and to act with the degree of care that an ordinary person would exercise under the same or similar circumstances.

75.     Defendants each breached this duty of care by engaging in grossly negligent conduct, failing to exercise any judgment, failing to act in an informed, deliberate, and rational manner, and by totally abdicating their responsibilities with respect to protecting First Choice from the unlimited risk inherent in underwriting the losses of the Arizona JV, the Colorado JV, and the Texas JV through advances that they knew were unauthorized, undocumented, nonrecourse, and unrecoverable and that they knew were specifically prohibited by the contracts governing those joint ventures.

76.     Each Defendant's failure to ensure or otherwise implement monitoring or controls over First Choice cash advances on behalf of each joint venture involved an extreme degree of risk considering the potential harm.  Further, Defendants acted with an actual, subjective awareness of the risk involved and nevertheless proceeded with at least conscious indifference.

77. Each Defendant knew that the joint ventures and their facilities, like the Adeptus Enterprise itself, required millions of dollars of overhead each month. They also knew that if the joint venture facilities were not profitable, First Choice would be spending money to prop those facilities up instead of supporting the facilities that First Choice actually owned. Defendants further knew that there was no limit to how unprofitable the joint venture facilities could be and thus no limit to the amount of cash that these joint ventures would drain from First Choice. And since First Choice owned the operating and deposit accounts of the Adeptus Enterprise, it was foreseeable that Defendants' causing First Choice to spend millions of dollars on unauthorized, unconsidered, unrecoverable, and unlimited cash injections would severely impair liquidity and thereby threaten the existence of every entity in the Adeptus Enterprise, to which they also owed fiduciary duties.

78. Defendants' breaches included the following:

- Failing to monitor amounts advanced by First Choice on behalf of the Arizona JV, Colorado JV, or Texas JV;

- Failing to limit the amounts advanced by First Choice on behalf of the Arizona JV, Colorado JV, or Texas JV, so to as to comply with the requirements and prohibitions of the Line of Credit Agreements, Revolving Notes, Operating Agreements and Management Agreements;

- Failing to implement any system or internal controls to monitor and police if the amounts that First Choice paid on behalf of the Arizona JV, Colorado JV, or Texas JV exceeded their respective credit limits;

- Treating the facilities owned by the Arizona JV, Colorado JV, and Texas JV as though they were owned by First Choice, thereby causing First Choice to completely fund their operations and underwrite their losses;

- Failing to alert any Adeptus accounting personnel of the $3 million lines of credit and the contractual and economic risks triggered if First Choice advanced more than $3 million on behalf of a joint venture; and

- Causing First Choice to advance more than $3 million to each of the joint ventures without the necessary approvals or consents and in violation of the Operating Agreements and Management Agreements.

79.     As a direct and proximate result of their gross negligence and reckless behavior, Defendants caused First Choice to suffer substantial damages in the form of at least 50.1% of the $100 million in uncollectable JV Receivables that were written off during the Bankruptcy Case.

80.     Accordingly, the Trustee seeks to recover these damages from Defendants.

## Count 2
## Breach of Fiduciary Duty of Loyalty

81.     The Trustee re-alleges the allegations set forth in the above paragraphs.

82.     Defendants, as officers of First Choice, owed a fiduciary duty of loyalty to First Choice, obligating each to act in good faith, with candor and full disclosure of material information, and in the best interests of First Choice.

83.     Each Defendant breached his fiduciary duty of loyalty to First Choice by acting in bad faith and with a purpose other than that of advancing First Choice's best interests.  They consciously disregarded their oversight responsibilities with respect to monitoring the joint ventures' use of First Choice cash.  And they utterly failed to assure a reasonable information and reporting system existed with respect to First Choice's funding the joint ventures' operations.

84.     Each Defendant knew that, despite the prohibitions in the Operating Agreements and Management Agreements and despite their representations to the Adeptus Non-Insider Board, they were having First Choice fund the joint ventures' operations.  Each further knew that they were having Adeptus Management consolidate the joint ventures' financials into the already-consolidated financials of the Adeptus Enterprise, such that no Adeptus Non-Insider Board member, investor, or Adeptus Enterprise employee reviewing those systemwide financials would glean (a) that First Choice was paying all costs and expenses of the joint ventures despite having

24

no obligation to do so and in violation of several contracts, (b) how much the joint ventures had borrowed on their respective credit lines with First Choice, (c) the amount of the "Other Receivables" entry on the Adeptus Enterprise balance sheet that consisted of JV Receivables in excess of the $3 million credit lines, or (d) how much cash First Choice had spent firming up the joint ventures.

85.     Their own financial interests motivated this opaqueness.  Each Defendant's compensation was tied to the financial performance of the Adeptus Enterprise, and each Defendant faced clawback penalties if financials had to be restated.  Had Defendants disclosed the amount of control that they were exercising over the joint ventures or the undisclosed financial support that they were causing First Choice to extend, the Adeptus Enterprise—as the primary beneficiary of those variable interest entities—would have had to recognize the joint ventures' losses as its own, rather than keeping their losses and the related-party nature of those dealings off-book.  This would have, at a minimum, required the Adeptus Enterprise to restate its financials and to write off more than $209 million in gains that the Adeptus Enterprise had recorded based on its contributions to the joint ventures.

86.     This, however, was never done, allowing each Defendant to collect (and keep) bonuses to which they were not entitled.

87.     As a direct and proximate result of their bad faith and conscious indifference, Defendants caused First Choice to suffer substantial damages in the form of at least 50.1% of the $100 million in uncollectable JV Receivables that were written off during the Bankruptcy Case.

88.     Accordingly, the Trustee seeks to recover these damages from Defendants.  In addition, the Trustee seeks disgorgement from Defendants of all salaries, bonuses, and other

compensation paid to Defendants during the time that they were breaching their fiduciary duty of loyalty.

## TOLLING OF LIMITATIONS

89.     All statutes of limitations applicable to the Trustee's claims have been tolled since the filing of the Bankruptcy Case on April 19, 2017, pursuant to 11 U.S.C. § 108 and pursuant to a Tolling Agreement between the Trust and all Defendants, effective from February 18, 2019 through May 17, 2019.

## JURY DEMAND

90.     The Trustee demands a trial by jury for all issues.

## PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against Defendants as follows:

- awarding compensatory, consequential, and/or monetary damages in an amount to be determined at trial;

- disgorging all salaries, bonuses, and other compensation paid to Defendants during the time that they were breaching their fiduciary duties of loyalty;

- awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity; and

- granting such other and further relief, at law or in equity, as this Court deems just and proper.

Dated:    May 17, 2019

Respectfully submitted,

*/s/ Brandon V. Lewis*
William T. Reid, IV (Texas Bar No. 00788817)
Eric D. Madden (Texas Bar No. 24013079)
Joshua J. Bruckerhoff (Texas Bar No. 24059504)
Brandon V. Lewis (Texas Bar No. 24060165)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4250
Dallas, Texas 75201
(214) 420-8900 (T)
wreid@rctlegal.com
emadden@rctlegal.com
jbruckerhoff@rctlegal.com
blewis@rctlegal.com

*Counsel to Drivetrain, LLC, as Trustee of the*
*Adeptus Litigation Trust*